UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___03/18/2022___
```

Kia Shonika Mason,

                    Plaintiff,

         -against-

Commissioner of Social Security,

                  Defendant.

20-cv-07648 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

      Plaintiff Kia Shonika Mason ("Mason" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Not. of Mot., ECF No. 21; Comm'r Not. of Mot., ECF No. 27.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is GRANTED and the Commissioner's cross-motion is DENIED and this action is remanded for further administrative proceedings.

**BACKGROUND**

**I.    Procedural Background**

      Mason filed an application for DIB on October 25, 2017 and an application for SSI on November 7, 2017, with an alleged disability onset date of October 9, 2017. (Administrative R., ECF No. 18 ("R."), 213, 217.) The Social Security Administration ("SSA") denied her applications on January 18, 2018, and Mason filed a written request for a hearing before an Administrative

Law Judge ("ALJ") on February 9, 2018. (R. 106, 110, 114, 122.) A video hearing was held on April 17, 2019 before ALJ Kieran McCormack. (R. 47.) Mason was represented at the hearing by attorney Shayan Farooqui. (*Id.*) In a decision dated May 10, 2019, ALJ McCormack found Mason not disabled. (R. 24.) Mason requested review of the ALJ decision from the Appeals Council. (R. 210-12.) Her request was denied on July 17, 2020, making ALJ McCormack's decision the Commissioner's final decision. (R. 1-6.) This action followed.

## II.   Non-Medical Evidence

Born on March 11, 1970, Mason was forty-seven years old on the alleged disability onset date. (*See* R. 242, 264.) Mason has a tenth-grade education. (R. 246.)

From approximately April 2007 through some time in 2015, Mason worked as a dishwasher for a senior living facility. (R. 54, 246, 285.) From approximately some time in 2016 through October 2017, she worked as a prep cook at the same senior living facility, before taking a leave of absence. (R. 55, 246, 318, 521.)

## III.   Medical Evidence Before the ALJ[1]

### A.   Dr. Jennifer Ringstad, M.D. — Treating Internal Medicine Physician

The record indicates that Dr. Jennifer Ringstad, M.D., at St. Joseph's Medical Center, began treating Mason on June 15, 2017. (*See* R. 501-04.) At that visit, Mason presented with bilateral leg pain she described as constant and worsening, throbbing and aggravated by sitting and standing. (R. 501.) Mason reported that the pain had started approximately one year prior

---

[1] Plaintiff only challenges, and the parties have only briefed, the ALJ's residual functional capacity ("RFC") determination based on his evaluation of opinion evidence from Dr. Kaci, Dr. Ringstad and Dr. Kazmi and Plaintiff's subjective complaints regarding Plaintiff's lumbar and degenerative disc impairments (*See* Pl.'s Mem., ECF No. 22, at 10-17; Comm'r Mem., ECF No. 28, at 2 n.1.) Accordingly, the Court summarizes and analyzes herein the evidence related to those conditions.

and that it was relieved by prescription pain medications. (*See id*.) On neurological examination, Dr. Ringstad found that Mason was in "no acute distress," but had pain with right knee flexion against resistance. (R. 503.) Dr. Ringstad noted that she felt Mason's pain was muscular. (*Id.*) As of this visit, Dr. Ringstad recorded Mason's medications relating to her back pain as Gabapentin[2] 600 mg and Meloxicam[3] 7.5 mg. (*Id.*)

When Mason saw Dr. Ringstad on July 17, 2017, she continued to present with bilateral leg pain that Mason described as throbbing and bothered her most when resting. (R. 505.) Mason also reported that she had been forgetting her morning dose of Gabapentin. (*Id.*) On constitutional examination, Dr. Ringstad recorded no acute distress. (R. 507.) Dr. Ringstad did not record any musculoskeletal or neurological examination at this visit. (*Id.*)

At the next visit with Dr. Ringstad on October 6, 2017, Mason presented with sciatica pain radiating to the right calf and thigh that was aggravated by standing and walking and created weakness in the right leg. (R. 509.) Dr. Ringstad noted, after reviewing magnetic resonance imaging ("MRI") results, that Mason had "mild radiculopathy bilaterally"[4] the prior year but was never recommended surgery, which Dr. Ringstad noted was "probably not a good idea" due to the chronicity of Mason's pain without neurological compromise. (R. 511-12.) On constitutional examination, Dr. Ringstad noted that Mason was in pain and had trouble sitting on a chair. (R.

---

[2] "[G]abapentin is an anticonvulsant medication that affects chemicals and nerves in the body involved in the cause of seizures and some types of pain." *Bull v. Colvin*, No. 13-CV-00032 (MAT), 2014 WL 6627491, at *3 (W.D.N.Y. Nov. 21, 2014) (citation omitted).

[3] "Meloxicam is a medication used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis." *Jackson v. Kijakazi*, No. 20-CV-07476 (JLC), 2022 WL 620046, at *2 (S.D.N.Y. Mar. 3, 2022) (citation omitted).

[4] Radiculopathy is a disorder of the spinal nerve roots. *See Woo v. Colvin*, No. 16-CV-08078 (JMF) (SDA), 2018 WL 1027158, at *4 (S.D.N.Y. Feb. 2, 2018), *report and recommendation adopted*, 2018 WL 1033230 (S.D.N.Y. Feb. 21, 2018).

511.) On neurological examination, Dr. Ringstad found that the examination was "difficult," but that Mason's strength and sensation were grossly intact. (*Id.*)

On November 2, 2017, Mason presented with the same symptoms as her previous visit, except she also reported radiating pain to the left and right thighs and that she had received an injection one week prior which did not help at first but may have helped on the side in which the injection was given. (R. 513.) On musculoskeletal examination, Dr. Ringstad noted that Mason had an antalgic gait[5] and encouraged her to continue with pain management.[6] (R. 515.)

Mason saw Dr. Ringstad for another visit on November 30, 2017, where she continued to complain of pain in her lower back and legs, more so in the right leg than the left leg, causing burning and numbness and aggravated by daily activities, sitting and walking. (R. 517.) On constitutional examination, Dr. Ringstad observed no acute distress and found that Mason was "[s]till in obvious pain" when walking and had to "lean over exam table when waiting" but was otherwise able to get on and off the exam table. (R. 519.) Dr. Ringstad also noted that Mason's most recent MRI, from November 16, 2017, showed worsening degenerative changes compared to the MRI from the prior year. (*Id.*; *see also* R. 336-37.)

At a December 28, 2017 visit with Dr. Ringstad, Mason complained of pain in the right posterior hip region and right knee and brought an RFC physical assessment form for Dr. Ringstad to complete. (R. 521.) Mason stated that she used a cane in the house but "[did not] like to use [it] outside because she [thought] she [was] too young." (*Id.*) On examination, Dr. Ringstad noted

---

[5] "An antalgic gait is one in which the stance phase of walking is shortened on one side due to pain on weight bearing." *Laureano v. Comm'r of Soc. Sec.*, No. 17-CV-01347 (SDA), 2018 WL 4629125, at *3 (S.D.N.Y. Sept. 26, 2018) (citation omitted).

[6] As set forth in Background Section III(F) below, Plaintiff saw Dr. Debiec for pain management treatment beginning in October 2017.

that Mason was sitting more comfortably in the chair, but had trouble getting up an on to the exam table. (*Id*.) Dr. Ringstad also noted that Mason had an antalgic gait, but her right knee was normal on inspection and had normal range of motion. (*Id*.)

Dr. Ringstad completed the RFC assessment based on Mason's answers "and how things were when she was working" (R. 523), diagnosing her with "lumbar disc disease causing sciatica." (R. 313.) Dr. Ringstad opined that Mason could walk two blocks without rest or significant pain, could sit for a total of one hour and stand for a total of two hours in an eight-hour workday, would need to take unscheduled breaks every hour and would need to recline or lie down in excess of regularly scheduled breaks during an eight-hour workday, could occasionally lift ten pounds or less but could never lift greater than ten pounds and likely would be absent from work three to four times per month. (R. 313-14.)

On January 23, 2018, Dr. Ringstad wrote a letter addressed to Mason's employer in support of her continued leave of absence from work, stating that "[Mason] ha[d] not made sufficient recovery to return to her previous job." (R. 318.) Dr. Ringstad next saw Mason on February 16, 2018, where she complained of pain in her right-side buttock, posterior thigh and tailbone. (R. 529.) On musculoskeletal examination, Dr. Ringstad found only discomfort in Mason's hip movements, but otherwise all inspections and ranges of motion were normal. (R. 531.) Dr. Ringstad also found that Mason was able to squat and get up on her toes. (*Id.*) Dr. Ringstad noted that Mason recently had seen a new neurologist, Dr. Kazmi,[7] who believed she may be a candidate for surgery and sent her to a new pain management doctor to get another

---

[7] *See* Background Section III(D), *infra*.

epidural injection and that Mason agreed with this plan and was willing to undergo surgery if necessary. (R. 529, 531.)

At the next visit on March 26, 2018, Mason reported feeling better after going to physical therapy. (R. 533.) On musculoskeletal examination, Dr. Ringstad found that Mason had an antalgic gait and had trouble bearing full weight on the right side while walking. (R. 535.) At the next visit on May 14, 2018, Mason saw Dr. Ringstad primarily for complaints not related to her back pain, thus Dr. Ringstad did not evaluate Mason for her back pain during this visit. (*See* R. 543-46.) The next visit on June 18, 2018 was similar to the previous visit in that Dr. Ringstad evaluated Mason for complaints not related to her back pain. (*See* 558-61.) Dr. Ringstad did not record any abnormalities relating to Mason's back pain in her physical examinations of Mason on either the May 14 or June 18 visit. (*See* R. 545, 560.)

Mason next saw Dr. Ringstad on December 3, 2018, when she complained that the "[i]njections and medications [were] not helping with pain" but she "fe[lt] like she ha[d] to take them anyway" so she was not really taking the medications regularly and that caring for her grandchildren was stressful and physically taxing. (R. 590.) Dr. Ringstad recorded "no acute distress" in her physical examination of Mason but did not include a musculoskeletal or neurological examination. (R. 593.) Dr. Ringstad advised Mason to take medications that help, and Mason stated that Gabapentin and NSAID "help some." (R. 593.) At a December 26, 2018 visit with Dr. Ringstad, Mason stated that her back pain had improved but that she had right lower flank pain. (R. 604.) On examination of Mason's abdomen, Dr. Ringstad found

costovertebral angle ("CVA")[8] tenderness possibly on the right side, but otherwise no acute distress. (R. 606.)

Dr. Ringstad completed another RFC physical assessment on February 1, 2019, diagnosing Mason with intervertebral disc disorder with lumbar radiculopathy and carpal tunnel syndrome. (R. 342-43.) Dr. Ringstad opined that Mason could walk one block without rest or significant pain, could sit for a total of four hours and stand for a total of four hours in an eight-hour workday, would need to take unscheduled breaks every half hour but would not need to recline or lie down in excess of regularly scheduled breaks during an eight-hour workday, could frequently lift ten pounds or less, but could never lift greater than ten pounds and likely would be absent from work one to two times per month. (*Id.*)

###    B.    Dr. Julia Kaci, M.D. — Internal Medicine Consultative Examiner

On November 17, 2017, internist Dr. Julia Kaci performed an internal medicine consultative examination of Mason. (R. 306-10.) Mason reported to Dr. Kaci that she had had a history of lower back pain for years but that the pain had worsened in the last couple of years (with the pain described by Mason as "constant, sharp, 9/10 in intensity") and radiated down both legs, with the pain being worse and associated with numbness and tingling in the right leg. (R. 307.) She stated that she felt afraid of falling when she walked and that she had a recent injection on October 27, 2017, "which did not help." (*Id.*)

Under "Activities of Daily Living" Dr. Kaci noted that Mason "cooks once or twice a week" with help from her children, cleans two to three times a week, does laundry every other week,

---

[8] The CVA "is the acute angle formed between the lowest rib and the vertebral column." *Chromey v. Astrue*, No. 11-CV-00103 (SHR), 2012 WL 123548, at *5 (M.D. Pa. Jan. 17, 2012).

does shopping as needed, showers and dresses herself, and liked to read, watch TV, go out to appointments and socialize with friends. (R. 307.) Dr. Kaci noted that Mason smoked cigarettes daily and was taking the medications Gabapentin 600 mg and Meloxicam 7.5 mg as of the date of Dr. Kaci's examination. (*Id.*)

On examination, Mason appeared to be in "no acute distress," had a slightly antalgic gait, could walk on heels and toes with difficulty, could squat half of full with help, had a normal stance, needed no help changing for the examination or getting on and off the table, was able to rise from the chair without difficulty and used no assistive devices. (R. 308.) Dr. Kaci also found that Mason's lumbar spine showed flexion of 80 degrees, extension of 20 degrees, full bilateral lateral flexion and rotary movement and positive straight leg raising at 30 degrees in the right leg. (R. 309.) In addition, Dr. Kaci observed decreased sensation throughout Mason's right leg but full strength in the lower extremities. (*Id.*) Upon review of an x-ray of Mason's lumbosacral spine taken on November 20, 2017 showing "mild degenerative spondylosis . . . at L2-L3 through L4-L5"[9] and "mild degenerative disc disease . . . at L5-S1" (R. 311), Dr. Kaci noted that the x-ray showed "mild degenerative changes" in the lumbosacral spine.[10] (R. 309.)

Dr. Kaci diagnosed Mason with chronic lower back pain and radiculopathy and opined that Mason had "moderate limitation with prolonged sitting, standing, walking, kneeling, squatting, lifting, carrying, pushing and pulling," with mild limitation to bending. (R. 309.)

---

[9] "Spondylosis is defined as stiffening of the vertebrae; often applied nonspecifically to any lesion of the spine of a degenerative nature." *Woo,* 2018 WL 1027158, at *8 (citation and internal quotation marks omitted).

[10] "Lumbosacral refers to the lumbar and sacral regions of the spine." *Lindo v. Saul*, No. 18-CV-01070 (SDA), 2019 WL 4784921, at *2 (S.D.N.Y. Sept. 30, 2019) (citation omitted).

### C.    Dr. L. Marasigan — State Agency Medical Consultant

On December 11, 2017, Dr. L. Marasigan reviewed and evaluated Mason's medical record, including Dr. Kaci's opinion, and provided an RFC assessment. (R. 82-89.) Dr. Marasigan opined that Mason could stand and/or walk for a total of six hours and sit for a total of six hours in an eight-hour workday, was limited in pushing and/or pulling with her right extremities, could occasionally lift and/or carry 50 pounds and could frequently lift and/or carry 25 pounds, and could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 86-87.) Dr. Marasigan further opined that Mason could perform medium work with the exertional limitation that she could not operate a foot control with her right leg due to right leg pain. (R. 86, 88.)

### D.    Dr. Mahmoon Kazmi, M.D. — Treating Neurologist

The record indicates that Mason began seeing neurologist, Dr. Mahmoon Kazmi, a colleague of Dr. Ringstad at St. Joseph's Medical Center, starting on February 12, 2018, where Mason presented with continued back pain, which she reported began five years prior, that radiated through right leg down to her right foot with paresthesia[11] and increased urinary frequency. (R. 525-28.) On examination, Dr. Kazmi found that Mason's pain was mostly in L4-L5 and L5-S1 distribution, that Mason's November 2017 lumbar MRI showed a L3-L4 and L5-S1 disc

---

[11] "Paresthesia is defined as a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet." *Cabrera v. United States*, No. 18-CV-07270 (SDA), 2020 WL 5992929, at *4 (S.D.N.Y. Oct. 9, 2020), *appeal dismissed* (Feb. 18, 2021).

bulge impinging on the thecal sac[12] and partially compromising adjacent neural foramina,[13] and

a T11-T12 and T12/L-1 disc bulge impinging on the thecal sac. (R. 526.) Dr. Kazmi further found

that Mason had a positive straight leg raising at 90 degrees in the right leg and diminished reflexes

in her knees and ankles. (R. 527.) Dr. Kazmi opined that cauda equina process[14] was possible,

although he doubted it and that Mason was a surgical candidate given intractable/activity

hampering pain. (*Id*.) Dr. Kazmi also added a prescription for Nortriptyline[15] 25 mg to Mason's

medication regimen. (*Id.*)

Mason next saw Dr. Kazmi on April 9, 2018, where she reported that she could not

tolerate the newly prescribed Nortriptyline, but that her pain was somewhat improved while

undergoing physical therapy.[16] (R. 537.) On physical examination, Dr. Kazmi found no change

from the previous appointment. (R. 539) On the same day, Dr. Kazmi provided a narrative relating

---

[12] "Thecal sac is defined as the membranous sac of dura mater covering the spinal cord and cauda equina and containing cerebrospinal fluid." *Maldonado v. Berryhill*, No. 16-CV-00165 (JLC), 2017 WL 946329, at *5 (S.D.N.Y. Mar. 10, 2017) (citation and internal quotation marks omitted).

[13] "Foramen (pl. foramina) is defined as, [a]n aperture or perforation through a bone or a membranous structure." *Musch v. Heckler*, No. 84-CV-03309 (JFK), 1985 WL 1619, at *4 (S.D.N.Y. June 11, 1985) (citation and internal quotation marks omitted).

[14] "Cauda refers to a tail or taillike appendage and equina refers to collection of spinal roots that descend from the lower part of the spinal cord and are located within the lumbar cistern of the caudal dural sac. Cauda equina syndrome is a group of symptoms caused by compression of the spinal nerve roots, including dull, aching pain of the perineum (the region occupying the pelvic outlet), bladder, and sacrum (the triangular bone just below the lumbar vertebrae) that generally radiates in a sciatic fashion and is associated with paresthesias (an abnormal touch sensation) and areflexic (absence of reflexes) paralysis." *Hollaway v. Colvin*, No. 14-CV-05165 (RA) (HBP), 2016 WL 96172, at *2 (S.D.N.Y. Jan. 8, 2016) (cleaned up) (citations omitted), *report and recommendation adopted*, 2016 WL 1275658 (S.D.N.Y. Mar. 31, 2016).

[15] "Notriptyline is a tricyclic antidepressant that affects chemicals in the brain that may become unbalanced." *Thomas v. Astrue*, No. 11-CV-01625 (MPS), 2013 WL 4746371, at *4 (D. Conn. Sept. 4, 2013) (citation omitted).

[16] According to Plaintiff's treatment notes, she attended physical therapy from at least March through May 2018. (*See* R. 533 (referencing third PT visit on March 26, 2018), 543 (May 14, 2018 note stating arthritis of hip being addressed in PT).)

to Mason's RFC assessment, stating that he was treating Mason for spinal stenosis.[17] (R. 316.) Dr. Kazmi opined that Mason's range of motion was limited in both legs, that she was unable to walk for more than one block, that she could not stand for more than 30 minutes and that she was unable to lift more than two pounds. (*Id.*)

At the next visit on June 11, 2018, Mason presented with "dull" back pain and reported that she stopped taking Nortriptyline due to increased urinary frequency and dry mouth; that Meloxicam was not helping despite taking it; and that the epidural injection from two months ago "helped somewhat." (R. 555.) Dr. Kazmi did not record a physical examination at this visit. (*See* R. 555-57.)

Mason next saw Dr. Kazmi on July 9, 2018 and reported that she had received an epidural injection which "helped back pain" and that she felt taking the Gabapentin helped as well. (R. 570.) Upon physical examination, Dr. Kazmi reported normal neurological findings. (R. 572.) At the next visit on December 17, 2018, Mason reported that her back pain had returned. (R. 596.) Upon physical examination, Dr. Kazmi reported normal neurological findings. (R. 598.) Based on the record, Mason's last visit with Dr. Kazmi was on January 28, 2019, where Mason reported that her pain remained the same and that she was taking Gabapentin "erratically." (R. 608.) On physical examination, Dr. Kazmi found no change from the previous appointment. (R. 610.) Dr. Kazmi instructed Mason to take Gabapentin regularly. (*Id.*)

---

[17] "Spinal stenosis . . . is defined as the narrowing of the lumbar or cervical spinal canal." *Cabrera*, 2020 WL 5992929, at *4 (citation omitted).

###### E.       Dr. Jean Kalache, M.D. — Treating Orthopedic Surgeon

On February 6, 2019, Dr. Jean Kalache, an orthopedic surgeon who had not seen Mason in almost three years prior to this visit, examined Mason who presented with severe pain which she described to be present over the inferior gluteal[18] area and the trochanteric[19] area. (R. 348-49.) Mason reported that she had severe stiffness when she sat for long periods and that she had been taking Motrin 800 mg with no relief. (*Id.*) On examination, Dr. Kalache found normal range of motion and no discomfort in Mason's right leg and an x-ray of the hip, taken prior to the visit, showed no major pathology in the hip joint. (*Id.*) Dr. Kalache advised Mason to consider injections for the pain and to return to the office for further treatment. (*Id.*)

###### F.       Dr. Jozef Debiec, M.D.—Treating Pain Management Physician

Mason saw Dr. Jozef Debiec in October and November 2017 for pain management and to receive epidural injections for her back pain. (R. 328-37.) On October 23, 2017, Mason presented to Dr. Debiec with sharp and radiating lower back and leg pain that she stated improved with rest and worsened by standing and walking. (R. 333.) On examination, Dr. Debiec found that Mason's lumbar spine showed flexion of 25 degrees, antalgic gait, positive straight leg raising at 30 degrees and grossly diminished reflexes in the bilateral lower extremities, but otherwise observed normal range of motion, motor skills and sensations. (R. 334.) On October 27, 2017, Mason returned to Dr. Debiec and received a lumbar epidural steroid injection at the L5-S1 level.

---

[18] "The gluteal muscles are a group of three muscles which make up the buttock." *Victor v. Boutte*, No. 21-CV-00484, 2021 WL 6621683, at *4 (E.D. La. Dec. 17, 2021), *report and recommendation adopted*, 2022 WL 194487 (E.D. La. Jan. 21, 2022).

[19] "[T]rochanteric refers to the two processes below the neck of the femur." *Algee v. McDonald*, No. 15-CV-00578, 2016 WL 747334, at *1 (Vet. App. Feb. 26, 2016) (citation and interior quotation marks omitted).

(R. 331.) Mason saw Dr. Debiec again on November 8, 2017 and reported a 50% improvement in pain since the epidural injection, but that her pain was still severe. (R. 329.) On examination, Dr. Debiec noted the same findings as the previous visit. (*Id.*) Dr. Debiec recommend that Mason undergo another lumbar MRI, which she did on November 16, 2017. (R. 329, 336-37.)

## IV.     The April 17, 2019 Administrative Hearing

Plaintiff appeared with counsel for an administrative hearing before ALJ McCormack on April 17, 2019. (R. 44-79.)

### A.     Plaintiff's Testimony

Plaintiff testified that she had worked at a senior living home as a dishwasher from approximately 2007 to 2015 and then worked as a prep cook from 2016 to 2017. (R 54-57.) She was first on a leave of absence due to her back pain and then left on disability. (R. 57-58.)

Plaintiff testified that there was no injury or event that caused her back problems, rather she believed her back pain was the result of "wear and tear from riding the school bus." (R. 57.) Plaintiff further testified that she had a shooting pain in her hip that caused her to lose balance. (R. 63.) She described the pain as "an all-day pain" that "doesn't allow [her] to walk too far or sit too long without being in pain, without having to stand up and stretch or something" and stated that on a bad day (which Plaintiff testified happened approximately four times per week) the pain was "a 15" out of 10 while on a good day the pain was a 10 out of 10. (R. 58.)

Plaintiff testified that on a good day she could "sweep [her] house and do some housework," but on a bad day she could not get out of bed or be touched because it hurt when her body was touched so she would lay in bed all day. (R. 64.) Plaintiff testified that she could lift five pounds at most, including a broom or frying pan if needed; that she could walk one block

without rest but would need to rest for five to ten minutes before walking another block; that she could sit for half an hour on a good day and ten minutes on a bad day without needing to get up and walk for five to ten minutes; that she could stand for five to ten minutes comfortably; that she could reach but could not bend down; that she could not sit for six hours at a desk nor could she stand for two hours in an eight-hour workday; that she took approximately three daytime naps in a week; and that she needed to elevate her legs three times a day. (R. 60-70.) Plaintiff testified that she had been taking at least one medication for over a year but that it did not help her and caused dry mouth and some weight loss as side effects. (R. 59.)

### B. Vocational Expert Testimony

Vocational Expert ("VE") Sugi Komarov also testified at the hearing. (R. 71-77.) ALJ McCormack asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background who could perform sedentary work and who could push, pull, climb, balance, stoop, kneel, squat, crouch and crawl on an occasional basis (R. 72.) The VE confirmed that under this hypothetical Plaintiff's RFC was limited to sedentary work and therefore she had no transferrable skills or past relevant work. (*Id.*) The VE testified that there are jobs in the national economy for such a hypothetical individual classified as "sedentary, with an SVP of two,"[20] including food/beverage clerk, semiconductor bonder, and a surveillance system monitor. (*Id.*)

---

[20] "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job. . . . SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job." *Urena-Perez v. Astrue*, No. 06-CV-02589 (JGK) (MHD), 2009 WL 1726217, at *20 (S.D.N.Y. Jan. 6, 2009) (citations omitted), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. June 18, 2009).

When considering the same hypothetical individual with the additional limitations that the individual could handle, finger and feel with the dominant right hand as well as grasp, turn and twist objects for 50% of the day during an eight-hour day, the VE stated that of the previously available jobs, only the surveillance system monitor job would be viable while the other two jobs would be precluded and that an additional job of call-out operator would also be available. (R. 73-74.) When considering the same hypothetical individual with the previously mentioned limitations and the additional limitation of requiring one absence per month, the VE responded that both viable jobs from the second hypothetical would remain viable. (R. 74.) Upon consideration of the same hypothetical individual, except one requiring two absences rather than one absence per month, the VE testified that both jobs no longer would be viable. (*Id.*) When considering the fifth and final hypothetical posed by ALJ McCormack of the same individual from the first hypothetical with the additional limitation of only being able to lift two pounds occasionally instead of the standard sedentary limit of ten pounds occasionally, the VE testified that the initial three jobs from the first hypothetical would still be viable "with minimal erosion." (R. 75-76.)

When asked by Plaintiff's counsel whether "an individual [being] off-task 15 percent of the day [] on an unscheduled basis, would [] eliminate or erode any representative work set forth [] in any of honorable Judge McCormack's hypotheticals" the VE confirmed that "[w]ith one being off-task 15 percent, one will not be able to maintain competitive working." (R. 76.)

## V.   ALJ McCormack's Decision and Appeals Council Review

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity

since October 9, 2017, the alleged disability onset date. (R. 13.) At step two, the ALJ determined that the following impairments were severe: "degenerative disc disease and disc bulges of the lumbar spine, and obesity." (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15-16.) The ALJ specifically considered Listing 1.04 and SSR 02-01. (R. 16*.*) He found that Plaintiff's lumbar impairment did not meet Listing 1.04 and that there was no evidence that Plaintiff's obesity, alone or in combination with another impairment, met or medically equaled a listing under SSR 02-01. (*Id.*)

The ALJ then assessed Plaintiff's RFC, determining that she "would be limited to work at a sedentary level with additional postural limitations consistent with the subjective allegations, objective medical evidence, and opinions of record." (R. 22.) The ALJ noted that, while he found that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms," he also found "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [] not entirely consistent with the medical evidence and other evidence in the record." (R. 18.) In evaluating Plaintiff's subjective complaints, the ALJ considered Plaintiff's engagement in daily activities and interaction, the conservative nature of Plaintiff's treatment, the effectiveness and side effects of Plaintiff's medications, and the consistency of Plaintiff's complaints with the medical evidence. (R. 18-19.)  With respect to the nature of Plaintiff's treatment, the ALJ stated that "no surgical intervention ha[d] been recommended at this time." (R. 19.)

Upon consideration of the medical evidence, the ALJ noted that he found Dr. Kaci's opinion persuasive because she was an impartial consultative examiner and "[h]er opinions [were]

supported by and consistent with her own examination of the [Plaintiff], as well as the rest of the clinical findings and objective testing contained in the record, which show limitation of movement in the lumbar spine with radicular pain in the right leg and disc degeneration evident on imaging." (R. 20.)

The ALJ stated that Dr. Marasigan's "opinion that [Plaintiff] had the capacity for medium work [was] unpersuasive." (R. 20.) In addition, he stated that the postural limitations assessed by Dr. Marasigan (*i.e.*, climbing, balancing, stooping, kneeling, crouching and crawling (R. 87)) were persuasive. (R. 20.)

The ALJ found unpersuasive the December 28, 2017 and February 1, 2019 medical opinions of Dr. Ringstad, noting that Dr. Ringstad's assessment of Plaintiff's RFC in each opinion was inconsistent with the other. (R. 20-21.) ALJ McCormack also found that Dr. Ringstad's medical opinions regarding Plaintiff's lumbar impairments were inconsistent with the majority of her own clinical findings given that Dr. Ringstad noted clinical abnormalities pertaining to Plaintiff's lumbar impairments only on three occasions following Plaintiff's alleged disability onset date and the remaining examinations were negative for any objective clinical abnormalities pertaining to lumbar impairments. (R. 21.)

The ALJ also found unpersuasive the April 9, 2018 medical opinion of Dr. Kazmi, noting that Dr. Kazmi only had seen Plaintiff twice prior to rendering his opinion and that Dr. Kazmi's subsequent examinations of Plaintiff were negative for significant clinical abnormalities and thus inconsistent with his April 9, 2018 opinion (R. 21-22.) ALJ McCormack further noted that, although treatment notes from both Dr. Ringstad and Dr. Kazmi showed evidence of consistently antalgic gait, the "overall record indicate[d] grossly normal musculoskeletal and neurological

findings with regards to the [Plaintiff's] lumbar impairment since the alleged onset of disability."
(R. 18.)

Moving on to step four, the ALJ found that Plaintiff had past relevant work as a kitchen helper and a cook helper, both of which were classified by the VE as unskilled jobs at a medium exertional level. (R. 22.) However, the ALJ found that Plaintiff was unable to perform past relevant work based upon the RFC as assessed by the ALJ. (*Id.*)

At step five, the ALJ considered Plaintiff's age, education and job skills, along with her RFC determination, and, based on testimony from the VE, concluded that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, including food and beverage order clerk, semi-conductor bonder and surveillance system monitor. (R. 23-24.) Therefore, the ALJ found that Plaintiff was not disabled during the relevant period and denied her claim for benefits. (R. 24.)

Following the ALJ's decision, Plaintiff sought review from the Appeals Council, which denied her request on July 17, 2020. (R. 1-5.)

## LEGAL STANDARDS

### I.      Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.   <u>Determination Of Disability</u>

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52.

III.    **Regulations Regarding Consideration Of Medical Opinions And Prior Findings For Applications Filed On Or After March 27, 2017**

Previously, the SSA followed the "treating physician rule," which required the agency to give controlling weight to a treating source's opinion so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, the regulations relating to the evaluation of medical evidence were amended for disability claims filed after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01, at *5844 (Jan. 18, 2017). Because Plaintiff's claims were filed in October 2017 (*see* R. 82, 90, 101), the new regulations, codified at 20 C.F.R. §§ 404.1520c and 416.920c, apply. *See Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 7 (W.D.N.Y. 2021).

Under the new regulations, the Commissioner no longer will "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, when evaluating the persuasiveness of medical opinions, the Commissioner will consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." *Id.* §§ 404.1520c(c), 416.920c(c). Using these factors, the most

important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* §§ 404.1520c(b), 416.920c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added).

## DISCUSSION

Plaintiff argues that this action should be remanded because (1) the "ALJ erred in his evaluation of the opinion evidence, or alternatively, failed to develop the record with other opinion evidence" (Pl.'s Mem., ECF No. 22, at 10), and (2) the "ALJ failed to adequately assess Plaintiff's subjective complaints" (*id.* at 14), thereby leading to an RFC assessment that was not supported by substantial evidence. (*See id.* at 10, 17.) For her part, the Commissioner argues that

the ALJ's ruling should be upheld because it is supported by substantial evidence. (*See* Comm'r Mem. at 11.) For the reasons set forth below, the Court finds that the ALJ's RFC determination is not supported by substantial evidence.

ALJ McCormack assessed Plaintiff with the following RFC:

the claimant [may] perform sedentary work as defined in 20 CFR [sic] 404.1567(a) and 416.967(a) except the claimant can push/pull, climb, balance, stoop, kneel, squat, crouch, and crawl on an occasional basis. She cannot operate foot controls with her dominant leg.

(R. 16.) Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A sedentary job is one that would generally require an employee to sit about six hours total per eight-hour workday. *See* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). The ALJ stated that he based his RFC determination on Dr. Kaci's opinions and Dr. Marasigan's opinions about Plaintiff's postural limits, "as wel[l] as the totality of the medical evidence of record." (R. 22.) Plaintiff argues that the ALJ "overvalued" Dr. Kaci's opinion in his RFC assessment because her opinion that Plaintiff had "moderate limitation" was vague and unclear as to what "moderate" means. (*See* Pl.'s Mem. at 12.)

"It is not obvious that a 'moderate' limitation on sitting translates into a set number of hours." *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 487 (S.D.N.Y. 2018). Thus, although a moderate limitation in the ability to sit does not necessarily preclude a finding that the claimant can meet the sitting demands of sedentary work, *see, e.g, Lisa P. v. Comm'r of Soc. Sec.*, No. 19-CV-01155 (FPG), 2021 WL 826715, at *3 (W.D.N.Y. Mar. 4, 2021), "the ALJ must provide a sufficient explanation as to why, despite the claimant's moderate sitting limitation, the claimant 'could perform sedentary work.'" *Id.*; *see also Toomey v. Colvin*, No. 15-CV-00730 (FPG), 2016 WL

3766426, at *4 (W.D.N.Y. July 11, 2016) (ALJ required "to discuss and provide reasons tending to support the finding that, despite the moderate limitations the claimant could still perform light or sedentary work.") (alterations omitted)). The Court finds that the ALJ has not done so here.

The ALJ noted that Dr. Kaci's examination of Plaintiff was largely normal, but also noted Dr. Kaci's findings that Plaintiff had limited lumbar flexion and extension, positive straight leg raising in the right leg and decreased sensation in the right leg along with an x-ray of the lumbar spine that showed mild degenerative spondylosis and disc disease. (R. 20, 307-11.) Given these findings, the Court agrees with Plaintiff that it was improper for the ALJ to conclude that Dr. Kaci's opinion supported an RFC determination that Plaintiff could sit for approximately six hours per day. *See Brady v. Colvin*, No. 14-CV-05773 (ADS), 2016 WL 1448644, at *9 (E.D.N.Y. Apr. 12, 2016) ("In the absence of any other direct medical evidence on this point, the Court finds that the use of the terms, 'mild' and 'moderate,' to describe the Plaintiff's limitations with regard to sitting and standing do not provide enough to information to allow the ALJ to make the necessary inference that the Plaintiff could perform the full range of sedentary work.").[21]

Nor is the ALJ's RFC determination regarding Plaintiff's ability to sit supported by other substantial evidence in the record. There are two other opinions in the record regarding Plaintiff's sitting limitation, in addition to Dr. Kaci's opinion. First, Dr. Ringstad, whose opinion ALJ

---

[21] The Commissioner argues in her memorandum that "[t]he Second Circuit has repeatedly affirmed the proposition that opinions assessing 'moderate' limitations can support an RFC finding for sedentary or even light work, when considered alongside the totality of the record evidence." (Comm'r Mem. at 16 (citing cases)). However, "[t]he Second Circuit has held that when compiling an RFC from the record, an ALJ may not rely on opinions that employ the terms 'moderate' and 'mild' absent additional information." *Blau v. Berryhill*, 395 F. Supp. 3d 266, 281 (S.D.N.Y. 2019) (citations omitted). Nevertheless, "terms such as 'mild' and 'moderate' can constitute substantial evidence where 'the facts underlying that opinion and the other medical opinions in the record lend [the terms] a more concrete meaning.'" *Id*. (citation omitted). In the present case, as addressed herein, such facts and other medical opinions are lacking.

McCormack found unpersuasive (R. 21), opined on December 28, 2017 that Plaintiff could sit for one hour in an eight-hour day (R. 313), and opined on February 1, 2019 that she could sit for four hours in an eight-hour day. (R. 342.) Second, Dr. Marasigan opined on December 13, 2017 that Plaintiff could sit about six hours in an eight-hour workday. (R. 86.) However, the record does not reflect how the ALJ assessed this opinion by Dr. Marasigan.

The ALJ stated that Dr. Marasigan's "opinion that [Plaintiff] had the capacity for medium work [was] unpersuasive." (R. 20.) In addition, the ALJ stated that the postural limitations assessed by Dr. Marasigan (*i.e.*, occasionally able to climb, balance, stoop, kneel, crouch and crawl (R. 87)) were persuasive. (R. 20.) Nowhere does the ALJ specifically address the persuasiveness of Dr. Marasigan's sitting limitations.[22] Moreover, the ALJ does not base his RFC upon Dr. Marasigan's sitting limitations. (*See id*. at 22 ("This [RFC] conclusion is supported by impartial Dr. Kaci's opinions . . ., Dr. Marasigan's opinions about the claimant's postural limits . . ., as wel[l] as the totality of the medical evidence of record.").) Given the ALJ's assessment of the opinion evidence, there was little evidence remaining in the record regarding Plaintiff's sitting limitation, aside from raw medical findings, "which the ALJ was not qualified to interpret." *Delgado v. Comm'r of Soc. Sec.*, No. 18-CV-03960 (GBD) (DF), 2020 WL 957562, at *20 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted*, 2020 WL 953277 (S.D.N.Y. Feb. 27, 2020).

In sum, the Court finds that, because Dr. Kaci's opinion was impermissibly vague regarding Plaintiff's sitting limitation, and because the ALJ does not identify other record evidence upon which he relied regarding such limitation, the ALJ's determination that Plaintiff can perform

---

[22] The Commissioner argues that the ALJ "adopted the specific postural and exertional limitations opined by Dr. Marasigan" (Comm'r Mem. at 17), but the ALJ's decision only finds persuasive Dr. Marasigan's opinion regarding Plaintiff's postural limitations. (*See* R. 20.)

sedentary work is not supported by substantial evidence. *See Delgado v. Comm'r of Soc. Sec.*, 2020 WL 957562, at *19-20; *see also Calo v. Comm'r of Soc. Sec.*, No. 20-CV-03559 (AMD), 2021 WL 3617478, at *4 (E.D.N.Y. Aug. 16, 2021) (consultative examiner's "finding of 'moderate' limitations on the plaintiff's ability to sit, without more, does not provide substantial support for the ALJ's conclusion that she could sit for six hours a day") (citing cases). On remand, the ALJ must reconsider the question of whether Plaintiff could sit for the required six hours out of an eight-hour workday. The ALJ is free to develop the record further as appropriate.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion is GRANTED, and the Commissioner's cross-motion is DENIED. The case is remanded for further proceedings consistent with this Opinion and Order. The Clerk is respectfully requested to enter judgment.

**SO ORDERED.**

Dated:      New York, New York
            March 18, 2022

_____
STEWART D. AARON
United States Magistrate Judge